UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| LORI E. HARRIS, ESQ., INDIVIDUALLY, AND ON BEHALF OF ALL OTHER LICENSED ATTORNEYS SIMILARLY SITUATED; and THE UNIDENTIFIED CLIENTS OF LORI E. HARRIS WHOSE RIGHTS HAVE BEEN UNCONSTITUTIONALLY DEPRIVED<br><br>Plaintiffs,<br><br>against<br><br>CHIEF OF POLICE NEIL NOAKES, ACTING IN HIS OFFICIAL CAPACITY ON BEHALF OF THE FORT WORTH POLICE DEPARTMENT IN SERVICE OF THE CITY OF FORT WORTH; DET. RICHARD HOPEPPNER BADGE NO. 4066, ACTING INDIVIDUALLY AND ON BEHALF OF THE FORT WORTH POLICE DEPARTMENT, SARGEANT BRIAN JOHNSON BADGE NO. 3365 ACTING INDIVIDUALLY AND ON BEHALF OF THE FORT WORTH POLICE DEPARTMENT; and ONE OR MORE UNKNOWN POLICE OFFICERS OF THE CITY OF FORT WORTH ACTING INTHEIR OFFICIAL AND PERSONAL CAPACITIES<br><br>Defendants. | § § § § § § § § § § § § § § § § § § § § § § § § § § | Civil Action No. 4:24-cv-00340 |

## FIRST AMENDED COMPLAINT AND REQUEST FOR INJUNCTIVE RELIEF

### A. INTRODUCTION

1. Lori E. Harris, Esq., a Virginia-based immigration lawyer ("Harris" or "Plaintiff"), brings suit under Section 1983, a civil rights law passed by Congress that provides a remedy to those who

have been deprived of their federal constitutional rights under color of state law.[1] She has become the subject of an unreasonable search and seizure committed by the Fort Worth Police Department and its officers ("FWPD") during the course of an investigation and arrest in which the Defendants admit, as they must, that she is not a target. Indeed, because Plaintiff is undisputedly a "non-party," the State of Texas's district attorneys' office has all but refused to engage with both the criminal and civil counsel Plaintiff has hired to seek redress for the unconstitutional deprivation of both her civil liberties and she and her clients' property.

2. This is a tragic case, of possible first impression, in which an aggrieved United States citizen and officer of the court has fallen victim to an unchecked police department that has grown accustomed to using excessive force to seize property under the color of warrants supported by facially overbroad, knowingly false probable cause affidavits. The impact of this policy is catastrophic to Harris and her clients, whose data has fallen into the hands of these rogue officers without any meaningful forensic policy in place to safeguard the seized data.

3. The problem begins with a FWPD detective, who had been sitting on a stale investigation involving allegations of child pornography for over two years.[2] On information and belief, the detective received word of a subpoena seeking the production of the FWPD's investigatory file in a civil matter in which the alleged adult victims sought civil damages based on the same child pornography allegations (the "Civil Suit"). Days before being compelled to produce the investigatory file in the Civil Suit, the detective brushed off the alleged facts from a stale property seizure and forensic examination warrant and arrested the suspect. In so doing, the Detective

---

[1] This "federal remedy is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked." *Monroe v. Pape*, 365 U.S. 167, 183 (1961) (overruled on other grounds by *Monell v. Dep't of Soc. Servs*., 436 U.S. 658 (1978); *see also Patsy v. Bd. of Regents*, 457 U.S. 496, 516 (1982) ("[E]xhaustion of state administrative remedies should not be required as a prerequisite to bringing an action pursuant to § 1983.").

[2] It appears the statute of limitations was looming on the offense listed in the arrest warrant.

learned the suspect was represented by counsel in the Civil Suit, who was staying at his home when the police made the arrest. This counsel was Harris, who announced to the arresting officers that she was the suspect's lawyer, not a person living in his home. No officer took measures to verify Harris's residence at that time.

4. With full knowledge the suspect was represented by an attorney who was staying in the home, the Detective added a cursory edit to the search warrant probable cause affidavit. In a single sentence, the Detective swore Harris "said she also live[d] at the residence" of the suspect. The Detective did not state that he did a single thing to verify this hearsay; in fact; by the time he obtained the device warrant SW63868, he knew this information to be patently false. Nevertheless, the basis of a knowing misstatement regarding residence alone, the Detective illegally induced a municipal judge to add Harris as a suspect to the warrant authorizing the FWPD to broadly seize Harris's devices in addition to the actual alleged suspect's devices.

5. Next, even though the actual alleged suspect was already in custody, the Detective worked with his Sargeant-boss to assemble a team of at least ten patrol cars, armed with twelve officers carrying long-rifles to raid the suspect's home in the middle of the night. Both officers knew Harris would be sleeping there because she had already announced herself as the suspect's fiancée and attorney earlier in the day when he was arrested. The officers promised that she could be present when they interviewed her client and fiancée. Not only did they lie; they sent a veritable SWAT team to harass and intimidate her; ransacking and raiding the home while they made her stand for hours barefoot in the cold on the front lawn.

6. Despite the fact that Harris was a known attorney, the officers confiscated her iPhone, iPad, storage device, and MacBook computer she uses to represent her clients and store both her work product and her clients' protected attorney-client privileged files (the "Equipment"). They

seized this Equipment with full knowledge that it stored attorney-client privileged documents containing the privileged and statutorily protected information of hundreds of her immigration and healthcare clients. Thus, at the time they obtained a warrant to search the Equipment from the district judge acting as a magistrate, these officers had an implied if not legal duty to inform the magistrate judge they would be obtaining attorney client privileged and work product protected information belonging to an attorney who represented clients in hundreds of unrelated matters—not to mention the Civil Suit directly related to the facts supporting the arrest of the suspect. They did not. Instead, they allowed the magistrate judge to sign off on a warrant to both seize and search her work devices using the same probable cause affidavit containing knowingly false and misleading attestations of misconduct.

7. The Fort Worth Police Department has a mission statement that incorporates it general orders which pledges to protect the constitutional rights of its Fort Worth residents. But the utter lack of policies that underlie this mission statement are woefully inadequate, as evidenced by the fact that Harris has suffered a traumatic run-in with a municipal agency who has become all-too-accustomed with the City Council approving six-figure settlements for police misconduct ranging from illegal seizures to Whistleblower complaints involving the unconstitutional lack of cyber-security policies. Like the many cases before hers, Harris is the victim of a rogue Police Department who has now admitted in its opposition to Harris's TRO that a non-party to a criminal matter alleging to be aggrieved by an unconstitutional, facially overbroad warrant must submit to the jurisdiction of the Texas court who signed the unconstitutional warrant in order—just to prove that the seizure authorized by that very court was unconstitutional.

8. In the Democratic Republic of the United States of America, citizens are innocent until proven guilty; unless, they travel to the city of Fort Worth and stay with a suspect in a criminal

matter.[3] See U.S. Const. Art. In this unfortunate circumstance, an attorney like Harris—who expressly told the police she represented the suspect and many other clients whose constitutionally-protected documents reside in the equipment being seized—must voluntarily become a defendant herself in order to avail the protections afforded by the United States Constitution. This policy creates an obvious risk that those whose devices contain information the police know to be constitutionally protected will enjoy no legal mechanism to safeguard and protect their information.

9. The consequences of this unlawful seizure, accompanied by the woefully inadequate policy safeguarding the information seized, are inevitably catastrophic to both Harris and her clients. Missed deadlines and failures to appear before or respond to immigration officials can and will in all reasonable probability not only cost Harris her law licenses and result in malpractice; they will also result in her clients' deportation. Worse, despite the undisputed fact the FWPD seized thousands of attorney-client privileged documents from a known officer of the court, there was absolutely no plan in place for ensuring that Harris's clients' privileged material was adequately protected. Harris had to engage both a criminal and civil attorney to even view the probable cause affidavits brought against her—even though she had never been indicted or named a target of a FWPD investigation.[4] This tramples upon the due process rights of Harris and every attorney whose equipment is seized as part of a FWPD investigation, invades the privacy of every single one of Harris's clients and violates their constitutional right to privacy and adequate legal representation. In egregious circumstances like the one here, this policy (or apparent lack thereof),

---

[3] Notably, in reviewing Texas cases related to the underlying facts herein, it was revealed that cities like Houston have a distinct process for seizing privileged material. *See In re Cook*, 597 S.W.3d 589, 602 (Tex. App.—Houston [14th Dist.] 2020, pet. denied); supra at paragraphs 65-66.

[4] The probable cause affidavits were not attached to the warrants shown to Harris nor were they published by the police.

even deprives a non-party to a criminal investigation of the right to work. These consequences establish an "affirmative link between the policy" and these very concrete violations of the Plaintiffs' constitutional rights.

10. For the reasons that follow, Harris asks this Honorable Court to declare the malicious and egregious conduct of the FWPD unconstitutional and order the immediate return of her Equipment until such time as the FWPD is able to conduct a search and seizure that comports with the Fourth Amendment, if able.[5] Furthermore, the City has implemented an unworkable and constitutionally unsound policy of requiring citizens whose protected and/or privileged data is seized to prove their innocence before an extraction protocol will even be discussed.[6] Because this offers Harris and other clients and lawyers similarly situated no legally sufficient recourse to ensure their seized data is forensically safeguarded, Harris seeks permanent injunctive relief enjoining the FWPD from seizing and holding any equipment known to contain privileged and protected material of acting and licensed attorneys until the City has enacted constitutionally sufficient procedures for extracting and seizing protecting client information that comports with the Fourteenth Amendment.

## B. PARTIES

11. Plaintiff Lori E. Harris is an individual residing at 6537 Kensington Ave., Richmond, Virginia, 23226. She may be served with process at that address or wherever she may be found.

---

[5] An Application for *Ex Parte* Temporary Restraining Order seeking this relief was filed concurrently with the Original Complaint. *See* ECF No. 3.

[6] In fact, during the conference between counsel as ordered previously by this Honorable Court, it was suggested Harris could just come down and unlock her devices and prove she is not involved with the suspect's alleged criminal activities.

12. Unnamed Plaintiffs John and Jane Doe are clients of Lori E. Harris whose identities are stored in the MacBook, iPad, iPhone, and external storage device the FWPD illegally seized in violation of their constitutional rights.

13. Unnamed Plaintiffs John and Jane Doe are unnamed attorneys who have suffered damages as a result of having confidential, privileged material subject to the Work Product Doctrine seized by the FWPD without any ascertainable protocol in place of safeguarding that material.

14. Defendant Richard E. Hoeppner No. 4066 is an individual residing in Tarrant County, Texas. He may be served with process at his place of business, the Fort Worth Police Department, Detective Unit, 1000 Calvert St., Fort Worth, Texas 76107, or wherever he may be found.

15. Defendant Brian Johnson No. 3365, is an individual residing in Tarrant County, Texas. He may be served with process at his place of business, the Fort Worth Police Department, Detective Unit, 1000 Calvert St., Fort Worth, Texas 76107, or wherever he may be found.

16. Defendant Neil Noakes is the Chief of Police acting in his official capacity for City of Fort Worth Police Department. He may be served with process by hand delivery at the City Secretary's service window, 100 Fort Worth Trail, Fort Worth Texas, 76102.

## C. JURISDICTION

17. This Court has jurisdiction of this claim brought pursuant to 28 U.S.C. § 1343; and 42 U.S.C. §§ 1983, 1985.

18. This Court also has jurisdiction to grant declaratory and injunctive relief against these individuals in their official capacities. *Thurston v. Dekle*, 531 F.2d 1264, 1269 (5th Cir. 1976).

19. Jurisdiction is also proper in this Court pursuant to 28 U.S.C. §1332(a)(1), because Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000.00, excluding interests and costs.

**D. VENUE**

20. Venue for this action is predicated upon 28 U.S.C. §1391(b)(2), where a substantial part of the property that is the subject of this action is situated.

**E. FACTS**

**Harris is a Virginia resident operating a remote law office in her fiancée's home.**

21. Lori Harris is a practicing attorney who lives in Richmond, Virginia. *See* Affidavit of Lori E. Harris, attached hereto as ECF No. 1-1 ¶ 29; Drivers' License of Lori E. Harris, attached as ECF No. 1-1, Ex. C. Harris has been licensed to practice law in Virginia for almost 24 years and the District of Columbia for almost 20 years. ECF No. 1-1 ¶ 52. Although she has practiced as a healthcare lawyer for most of her career, she currently represents international clients, some of whom are in detention, on federal immigration issues. *Id.* ¶ 38. Prior to engaging immigration clients, Harris represented clients with Social Security Disability claims at the Administrative Law Judge level. *Id.* ¶ 39. Consequently, the files Harris maintains on her clients' behalf contain personally identifiable information including, but not limited to, their social security numbers. *Id.* ¶¶ 38-39. She also maintains detailed medical records of healthcare clients who were/are subject to Federal HIPAA privacy and security rules. *Id.* ¶¶ 39-40.

22. In August of 2022, Harris began dating Texas-resident Ernest Nichols ("Nichols"), who has been the subject of a FWPD criminal investigation initiated by his former stepdaughters in April of 2023. *Id.* ¶ 54. Harris did not travel to Texas to visit Nichols for the first time until

August of 2023. *Id.* ¶ 55. They have since become engaged, and Harris has set up a law office so that she can practice remotely when she comes to visit Nichols in Texas. *Id.* ¶ 29.

**Harris represents her fiancée in a civil matter related to the FWPD investigation.**

23. Although Harris does not maintain a permanent residence in Texas, she has recently secured her Texas bar license on March 6, 2025. *Id.* ¶ 53. However, her only Texas client is Nichols, who was sued civilly in *O.N. and V.N. v. Ernest Robert Nichols*, Cause No. 342-351800-24 (342nd Dist. Court of Tarrant County, Texas, filed April 9, 2024). The Civil Suit was brought by the same former stepdaughters who had initiated the FWPD investigation a year earlier in April of 2023 and involves the same set of facts. *Id.* at ¶¶ 53, 12; *see also* Declaration of Leslie Ritchie Robnett, attached hereto as ECF No. 1-3 ¶ 2.

24. Because Harris had not obtained her bar card in Texas until March 6, 2025, she assisted licensed-attorney Leslie Ritchie Robnett in a paralegal/legal assistant capacity in the Civil Suit with respect to discovery and litigation tactics including, but not limited to, discussions related directly to legal advice.[7] *See id.* ¶ 3; ECF No. (Harris Dec.) ¶ 53. Once Harris's bar license was obtained, she would be able to appear formally on the pleadings as Co-Counsel to Ernest Nichols. ECF No. 1-3 (Robnett Dec.) ¶ 3. In her capacity as Nichols's co-counsel, Harris obtained some videos that were turned over to the FWPD during the course of the criminal investigation. ECF No. 1-1 (Harris Dec.) ¶ 58. These, however, are the work product of Leslie Ritchie Robnett. ECF No. 1-3 (Robnett Dec.) ¶ 4.

**FWPD arrests Harris's fiancée and client and refuses to produce a probable cause affidavit or warrant despite being told that Harris was an attorney.**

[7] It is undisputed under Texas law the attorney client privilege and work product of a client is protected when a paralegal or legal assistant works for an attorney who is representing a client.

25. In April of 2023, the FWPD signed a search warrant based on a probable cause affidavit drafted and signed by Detective Richard Hoeppner. *Id.* ¶ 55; *see also* Fort Worth Police Department Wanted Person Data Input, attached hereto as ECF No. 1-2 (the "Data Input"); Search Warrant No. SW6677 filed July 5, 2023, attached hereto as ECF No. 1-5 (the "2023 Search Warrant"). The 2023 Search Warrant describes the evidence "voluntarily brought" to the FWPD by one of Nichols's former stepdaughters "on April 25, 2023, for the offense of Possession of Child Pornography documented on Fort Worth Police Report 230030825." ECF No. 1- (2023 Search Warrant) p. 1. The search warrant authorized the FWPD to conduct forensic analysis on the items Nichols's stepdaughters surrendered to the detective based on a single paragraph in the attached probable cause affidavit of Det. Hoeppner:

> All items listed that were taken from the home by the mother and [stepdaughter] are capable of storing electronic data and search and analysis of these items is necessary to retrieve this data to obtain this evidence and to show who is responsible for the storage and sharing of this data.

ECF No. 1-4 (2023 Probable Cause Affidavit in SW6677) ¶ 24.

26. Despite the fact that the evidence allegedly supporting the criminal case against Nichols was turned over in April of 2023 and probable cause affidavit was completed in July of 2023, Det. Hoeppner apparently sat on the evidence and investigation until March 15, 2025.[8] *See* Warrant No. 2025 SW 00272, attached hereto as ECF NO. 1-5 (the "2025 Search Warrant"). Harris was visiting Nichols for the weekend when, at around 7:30 pm, two officers arrived at Nichols's residence and handcuffed Nichols outside of the home. ECF No. 1-1 (Harris Dec.) ¶¶ 3-4. Harris provided the officers Nichols's driver's license and informed them that she was Nichols's attorney

---

[8] Sadly, and what discovery will in all reasonable probability expose, Detective Hoeppner's reaction resulting in this entire miscarriage of justice was precipitated by Nichols sending a 10-day notice letter to the civil litigants he intended to subpoena the Plaintiffs in that matter. *See* Declaration of Leslie Ritchie Robnett, ECF No. 3-4 ¶¶ 4-8.

and fiancée. *Id.* ¶ 5. The officers did not ask Harris for her identification, which would have shown that she resided in Virginia. ECF No. 1-1, Ex. C (Harris Driver's License).

27. When Harris asked the officers why Nichols was being handcuffed, they informed her that there was a warrant for his arrest. *Id.* ¶ 6. Even though Harris stated that she was his attorney and demanded to view the warrant, the officers refused to allow her to see the warrant or speak with Nichols. *Id.* ¶¶ 7-10. The officers then informed her that "the public" was not allowed to view the warrant on the screen in their vehicle, and that Det. Hoeppner had instructed them not to allow her to speak with Nichols. *Id.* ¶¶ 8-10. As the officers left with Nichols, Harris specifically asked whether they were "detaining" or "arresting" him. Even though the officers told Harris they were "detaining" Nichols, this was not true. *Id.* ¶¶ 15. Det. Hoeppner's 2025 Search Warrant confirms that they had "arrested" Nichols. Search Warrant No. 00272 executed March 15, 2025, attached hereto as ECF No. 1-5 ¶ 29 (the "2025 Search Warrant"). Harris was told that Det. Hoeppner would contact her before he began his interview with Nichols—a statement which also proved to be untrue. ECF No. 1-1 (Harris Dec.) ¶ 12.

**To obtain an overbroad search warrant, FWPD lies about its interactions with Harris.**

28. Several hours after the FWPD arrested Nichols, Det. Hoeppner obtained the 2025 Search Warrant which, inexplicably, included "Lori Harris, white female, DOB 7/22/1965" and "the persons of Lori Harris W/F DOB 07/22/1965." ECF No. 1-5. However, Det. Hoeppner's probable cause affidavit was **exactly the same** as the one he had completed in 2023 (*compare* ECF No. 1-4)—save for the addition of a single conclusory paragraph incorrectly documenting Harris's residence:

> On March 15, 2025, Tarrant County Sheriff Deputy Christy arrested Ernest Nichols at 9916 Landing Way, Fort Worth, Texas, for the arrest warrant related to this case. Deputy Christy spoke with Lori Harris, who said she also **lives**

> [emphasis added] at the residence. In front of the residence, parked on the street, is a 2003 Chevrolet Silverado TX LP TBD3432 that Nichols owns.

*See* ECF No. 1-5 (2025 Search Warrant Probable Cause Aff.) ¶ 29.

29. This single paragraph is demonstrably false. Hoeppner intentionally misrepresented the truth related to Harris. Harris never told the police that she lived with Nichols; she announced herself as his fiancée and attorney and asked to see the warrant they were using to detain him. ECF No. 1-1 (Harris Dec.) ¶ 10. Not only was her request refused; the officers told her that she would be called when Detective Hoeppner was ready to interview Nichols. *Id.* ¶ 15.

30. Moreover, Harris was never asked for her driver's license or any other form of identifying information about herself—all of which would have confirmed that she resided in Virginia. ECF No. 1-1 (Harris Dec.) ¶ 29 & Ex. C (Driver's License). Intentionally and willfully ignoring these known facts, Detective Hoeppner added Harris as a suspect to a search warrant based only on incorrect and unverified hearsay information about her residence—wholly hiding from the municipal judge the fact that Harris was a licensed attorney who actively represented the suspect. ECF No. 1-5 (2025 Search Warrant Probable Cause Aff.) ¶ 29.

31. Herein lies what is really going on with Det. Hoeppner: The day he lied to a municipal judge to get his warrant was actually the 7th day of a 10-day notice to Plaintiffs in the Civil Action to seek discovery from a third party. *See* ECF No. 1-3 (Robnett Dec.) ¶¶5-6. The deadline to issue the subpoena to the FWPD had run and the next following Monday would have been the 10th day that Nichols's would be subpoenaing Detective Hoeppner for all of the evidence from the criminal investigation in the Civil Action. *Id.* ¶ 6. Given the suspect timing here, counsel for Nichols has reason to believe that plaintiffs in the civil suit—the same "alleged victims" who initiated the investigation and surrendered all of the evidence sought by the civil subpoena—are colluding with Det. Hoeppner. *Id.*

**After obtaining a facially overbroad search warrant, FWPD exercised unreasonably excessive force detaining Harris and seizing her law firm's Equipment**.

32. Once Det. Hoeppner obtained the overbroad search warrant, and while he already held Nichols in custody, Det. Hoeppner gathered 15 armed police officers to ransack Nichols's home at 1:00 a.m. ECF No. 1-1 (Harris Dec.) ¶ 16. After going to sleep, at about 12:15 a.m. on Sunday March 16, 2025, Harris was awakened by loud banging on the front door and a man's voice shouting – "Fort Worth Police, open up." *Id*. She opened the door to ten (10) officers with helmets and rifles yelling "ARE YOU LORI?" and "STEP OUTSIDE OF THE PREMISES NOW!" *Id.*

33. At this point, an officer holding an automatic weapon escorted Harris outside to the neighbor's yard in the cold without allowing her to retrieve shoes or a coat. *Id*. ¶ 17. There were twelve (12) SUV marked cruisers with emergency lights on, blocking the street from the neighboring houses on both sides of Mr. Nichols' house. *Id*. ¶ 18. After standing and shivering in the cold night air, Harris was eventually given a pair of shoes and a coat. *Id*. ¶ 17. She waited 45 more minutes without being allowed to use the restroom, talk to the detective, or even sit down. *Id*. ¶¶ 16-18.

34. Eventually, Harris repeated to Det. Hoeppner that she was one of Nichols's attorneys, that her laptop (MacBook Pro) and iPhone were not Mr. Nichols' property, and the devices contained attorney-client privileged information and content protected under the Work Product Doctrine—some of which related directly to her work representing Mr. Nichols. *Id*. ¶ 23-25; *see also* ECF No. 1-3 (Robnett Dec.) ¶ 4. Det. Hoeppner did not allow Harris to see the warrant when she requested it and refused to allow her to observe the search and seizure of the electronics stored in her upstairs office. *Id*. ¶¶ 28, 30, 31.

35. FWPD's search lasted until about 4 a.m., at which time FWPD Sargeant B. Johnson #3365 told Harris that her laptop and phone had been seized because they could contain "child

pornography." *Id.* ¶ 33. Again, Harris reiterated that those devices were integral to her practice of law, that they contained privileged, confidential attorney-client information and information protected under the Work Product Doctrine, and that they were not backed up on the cloud in a manner that would allow her to continue representing her clients.[9] *Id.* ¶ 35. When Harris asked again for the warrant authorizing the FWPD to confiscate these items, Seargent Johnson's only response was, "I know you are frustrated, and I might be able to ask forensics to prioritize but I know they will have a lot of work to do on Monday morning." *Id.* ¶ 36.

**FWPD actively conceals facts discovered about Harris's seized equipment from magistrate judge in order to obtain a device search warrant.**

36. After seizing the Equipment, and with full knowledge that Harris was NOT a resident of Fort Worth, Texas and an attorney whose privileged work product was seized, Det. Hoeppner and Sargeant Johnson set to work legitimizing the FWPD's seizure. *See* 2025 Device Warrant, attached hereto as ECF No. 1-6. On information and belief, Sargeant Johnson wholly declined to work with whatever forensic unit he had represented he "might" be able to prioritize the safeguard of her constitutionally-protected data. Despite twelve separate communications from Harris's criminal counsel, Harris was unable to obtain an official policy on who had the Equipment and what measures were in place to ensure her clients' data was protected. *See* Timeline of Official Correspondence, attached hereto as ECF No. 1-1, Ex. H.

37. Further, for his part, Det. Hoeppner obtained an additional device warrant that had **exactly** the same probable cause affidavit attached with exactly the same allegation of Harris's residency. ECF No. 1-6 (the "Device Search Warrant"). This time, because the raid had already taken place, Det. Hoeppner knew first-hand the statement sworn in his probable cause affidavit was false

[9] In fact the storage device is not even protected and absolutely contains privileged material of Harris' clientele. It can be presumed the police have already reviewed and copied this device.

because he personally spoke to Harris and told her he "didn't spend time with her on weekends" and that "people lie." ECF No. 1-1 (Harris Dec.) ¶ 29. At this moment, Hoeppner made a conscious decision to simply disbelieve Harris's legal position, then eventually cover up what he knew in order to forge on with the device warrant. ECF No. 1-6.

38. Even though Det. Hoeppner told Harris she would be able to view the warrant after FWPD completed its investigation, the FWPD absconded with Harris's Equipment, leaving behind the search warrant without a copy of the accompanying probable cause affidavit. *Id.* ¶ 43; *see also* Timeline of Official Correspondence, attached hereto as ECF No. 1-1, Ex. H. Once Harris was finally able to return to the house, she found her office ransacked and her personal suitcase rummaged through. *Id.* ¶ 32. Despite the fact that mail on Harris's desk was inside an office marked "Esquire" on the door, the FWPD went so far as to open this confidential mail and rifle through paper client files located on Harris's desk. *See id.* ¶ 32; Photograph of Lori Harris Office and Files taken March 16, 2025, are attached hereto as ECF NO. 1-1, Ex. C, D, E, F. Even though the FWPD was strictly authorized to search only for electronic devices that could contain evidence used to promote child pornography, Harris's paper files were reviewed and opened—notwithstanding the fact that they clearly read "Attorney Copy" across the top and were addressed from United States government agencies. *Id.*; ECF No. 1-1 (Harris Dec.), Ex. D, E & F.

**Once the FWPD absconded with privileged client material, Harris was afforded no reasonable mechanism to secure its return.**

39. No one, including the suspect Ernest Nichols, has the passwords to Harris's devices. *Id.* ¶ 45. Harris has never been questioned by law enforcement, has not been a suspect of any criminal investigation, and has not been indicted. *Id.* § 45. Despite this, Harris had to engage a criminal and civil counsel just to open a dialogue with the FWPD about the return of her client files. *See id.* ¶ 43; ECF No. 1-1, Ex. F (Timeline of Official Correspondence).

40. Worse, once Harris was finally able to review the probable cause affidavits in Nichols's criminal case, she learned she had become the target of Nichols's criminal investigation simply by virtue of a conclusory, hearsay statement from an officer, incorrectly stating that she told him she lived in Nichols's residence. ECF No. 1-5 (2025 Search Warrant); ECF No. 1-4 (2025 Probable Cause Affidavit) § 29. There is no allegation that that Harris has received any "child pornography," and the comment that she lived in Nichols's residence is patently false because both Harris's driver's license and the client documents the FWPD illegally searched in her remote office confirm that Harris's home and law office addresses are located in Virginia. *Id.* ¶ 49. Harris never told the FWPD she "lived" in Nichols's residence. *Id.* ¶ 50.

41. Regardless, to date, Harris has been wholly unable to retrieve her client data. *Id.* ¶ 60. For four weeks, the FWPD and Tarrant County DA's office have passed her from one office to the other, with neither side having any formal protocol for retrieving or protecting her client data. *Id.*; ECF No. 1-1, Ex. H (Timeline of Official Communications). Without a protocol to retrieve and safeguard Harris's client data, the FWPD has necessarily exposed Harris and her clients to severe repercussions—including but not limited to malpractice, disbarment, deportation, a waiver of privileges and in some cases, civil and/or criminal liability. ECF No. 1-1 ¶ 60.

## F. CAUSES OF ACTION

### COUNT 1: CIVIL RIGHTS VIOLATION OF THE PRIVACY AND PROPERTY RIGHTS OF LORI HARRIS AND JOHN AND JANE DOES 1-100 BY INTENTIONAL VIOLATION OF CONSTITUTIONAL RIGHTS AND PRIVILEGES UNDER THE COLOR OF LAW

42. The foregoing paragraphs are incorporated by reference as if fully set forth in this count.

43. This is a claim made against the individuals Richard Hoeppner #4066, B. Johnson #3365, and one or more unknown police officers of the City of Fort Worth, Texas in both their official

and personal capacities, and the Fort Worth Police Department serving in its official capacity as the policymaker for the City of Fort Worth. *See Hafer v. Melo*, 502 U.S. 21 (1991).

44. Governmental bodies and their officers and agents acting under the color of law may be sued under 42 USC 1983.

45. To bring an action within purview of § 1983, Harris must first have a protected life, liberty, or property interest, and then prove that government action resulted in a deprivation of that interest. 42 U.S.C.A. § 1983; *San Jacinto Sav. & Loan v. Kacal*, 928 F.2d 697, 700 (5th Cir. 1991).

**1. Harris and her clients have protected liberty and property interests.**

46. Here, Harris asserts that the City of Fort Worth a/k/a the FWPD and its officers, agents, and officials including the named officers violated her and her clients' 4th, 5th, 6th and 14th Amendment rights.

47. Harris asserts her 4th Amendment rights were violated. The 4th Amendment states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

48. Harris also asserts her 5th Amendment rights were violated. The 5th Amendment states: No person shall be deprived of life, liberty, or property, without due process of law. U.S. Const. amend. V. Imbedded within the Fifth Amendment due process right is the presumption that a person is innocent until proven guilty.

49. Harris' clients asserts hers and their 6th Amendment rights were violated. The 6th Amendment states:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

U.S. Const. amend. VI.

50. And finally, Harris, on behalf of herself and other attorneys similarly situated, asserts her 14th Amendment rights were violated. The relevant portions of the 14th Amendment state:

> No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States U.S. Const. amend. XIV, § 1-Privileges. nor shall any State deprive any person of life, liberty, or property, without due process of law.

U.S. Const. amend. XIV, § 1-Due Process.

51. 42 USC § 1983 expressly allows Harris and the individuals and entities she represents to sue all Defendants in Federal Court. Specifically:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C.A. § 1983.

52. Section 1983 has no preliminary requirements prior to exhaustion of any state remedies. *Id*. Harris asserts that she has no adequate remedy at law in state court to recover her privileged and protected property seized without due process. *See State v. Gault*, --- S.W.3d ----, Nos. 01-22-

00157, - 00364-CR, 2022 WL 4830811 4 (Tex. App.-Houston [1st Dist.] Oct. 4, 2022, no pet. and orig. proceeding).

53. This case turns on whether both Defendants had probable cause to seize Harris' property. They did not under any stretch of the imagination. Probable cause is determined under a totality-of-the-circumstances analysis. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Any probable cause must be reasonable. *Id*. at 240. In this case, Harris:

- Is a duly licensed attorney in three (3) jurisdictions.
- Represents Nichols in a related matter.
- Identifies as an attorney for Nichols to officers on multiple occasions.
- Identifies as an attorney for Nichols prior to Detective Hoeppner seeking a warrant to seize property.
- Is not a suspect in Nichols' alleged crimes.
- Is not under investigation for any crime.
- Is not living with Nichols.
- Is not linked in any way to Nichols and/or by any alleged fact supporting any alleged crime other than she supposedly "live[d]" in his home.
- Was not present during the period of time when the alleged crimes were committed, as she was not even in communication with Nichols at the time, much less dating him.
- Does not allow anyone to have her codes for her electronic equipment.
- Does not make any statement to any law enforcement officer that would indicate she is a witness to any crime or has any evidence of a crime.

Despite these undisputed facts, an agent of the Fort Worth Police Department was able to obtain a search warrant so broad that it confiscated her entire law practice—simply by adding a single, conclusory, hearsay statement about her residence to a stale, two-year-old property and forensic examination search warrant. *See* ECF No. 1-4 (2025 Search Warrant) ¶ 27. When he added this paragraph, Det. Hoeppner knew Harris was a licensed attorney who actively represented the suspect. ECF No. 1-1 (Harris Dec.) ¶ 5-7. Yet he declined to add this relevant information, thereby actively shielding the magistrate judge from executing a search warrant based on all of the known facts. ECF No. 1- (2025 Search Warrant).

54. In short, the importance of attorney-client privilege matters. And it matters not only for particular parties but for the system of justice at large. "Its purpose is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). Although the privilege may at times prevent the government from obtaining useful information, "this is the price we pay for a system that encourages individuals to seek legal advice and to make full disclosure to the attorney so that the attorney can render informed advice." *In re Grand Jury Subpoena for Attorney Representing Criminal Defendant Reyes-Requena*, 926 F.2d 1423, 1432 (5th Cir. 1991) (Reyes-Requena II) (quoting *Matter of Grand Jury Proceeding, Cherney*, 898 F.2d 565, 569 (7th Cir. 1990)); *In re Grand Jury Proceedings*, 517 F.2d 666, 674 (5th Cir. 1975); *see also Taylor Lohmeyer L. Firm P.L.L.C. v. United States*, 982 F.3d 409, 411 (5th Cir. 2020).

55. The reasonableness of a search and seizure related to attorney-client privileged documents and work product has been heavily scrutinized by the 5th Circuit as well as others. *See, e.g., Harbor Healthcare Sys., L.P. v. United States*, 5 F.4th 593, 595-96 (5th Cir. 2021).

56. *Harbor* is a case similar to this case except for one (1) detail. In *Harbor*, the person whose privilege was constitutionally trampled on was an employee of an unindicted suspect who engaged an attorney on behalf of the suspect. Herein, Harris is not a suspect but is employed by the actual suspect as an attorney. Of note, in *Harbor*, the 5th Circuit found an exclusionary finding was insufficient to address the harm and ordered a return of property and destruction of any copies. Harris is seeking the same relief, instanter.

57. Similarly in *Harbor*, as here, the investigating officer failed to tell the magistrate who approved the warrant that attorney-client privileged documents and Work Product Doctrine

documents existed. *Id*. at 599. Here, just as in *Harbor*, the detective completely failed to tell the municipal judge that Harris was an attorney. *Id*. Like *Harbor*, the detective did not seek express prior authorization when he had almost two (2) years to do so. *Id*. Similarly, here, just as in *Harbor*, the detective made no effort to respect any of Harris's constitutional rights. *Id*.

58. Importantly, *Harbor* also cites *United States v. Zolin*, wherein the Court discussed District Courts being unwittingly used to violate constitutional rights. *Id.* (citing *Zolin*, 491 U.S. 554, 571, (1989). This is no different than the Court's discussion in *Zolin* because the detective secured a search warrant without giving the court the full picture by disclosing known information that Harris was an officer of the Court who had announced that she represented the target of the investigation.

59. Even worse, Det. Hoeppner knowingly concealed information he had a duty to tell the municipal and district judge just to obtain the overbroad warrants. At the time he obtained the device search warrant, he knew that Harris' electronics contained Harris' other clients' constitutionally-protected data. If, after knowing for three (3) days an attorney was making claims of constitutional privilege related to both her privacy and that of hundreds of other client individuals, a Detective obtains a warrant that fails to even mention these constitutional issues, this active concealment creates tortious conduct on the part of the concealing officer that falls within the ambit of section 1983. In other words, Harris and her clients' rights were trampled once Det. Hoeppner detective submitted Harris' devices to forensic analysis under the authority of a district judge's order, acting as a magistrate. He did this, knowingly omitting critical information he knew the court would use to safeguard the constitutional rights of these unnamed client plaintiffs. By failing to notify the judge an attorney was involved in the warrant, the detective knowingly caused multiple clients of the attorney losing their privacy and property rights in

violation of the Fourteenth amendment. In fact, the assistant district attorney made it clear that a complete copy of Harris' Equipment was being made by the Fort Worth Police Department's forensic experts. The suggestion that she should just come down and unlock her Equipment is consistent with what has now been suggested by the City's attorney in this matter.

60. In *Harbor*, the search warrant was constitutionally unsound—even when the government had a taint team in place. Here, there are no similar protections that would even remotely safeguard these plaintiffs' constitutional rights. In fact, because Harris had to secure counsel to even see the probable cause affidavits, and that counsel has been passed back and forth from the FWPD to the DA with no apparent policy in place to extract and safeguard protected and sensitive data, there is reason to believe the FWPD has no process, procedure, or policy in place to protect constitutionally privileged and protected documents related to third parties who are not suspects, much less their attorneys.[10] Undoubtedly, Detective Hoeppner's utter failure to inform the Fort Worth municipal judge of the fact that attorney-client privileged documents were involved in the 2025 Search Warrant constitutes a callous disregard of Harris' rights and those of her clients—just like the 5th Circuit found in *Harbor*. 5 F.4th at 599.

61. Further, the *Harbor* court also analyzed virtually identical facts under Fed. R. Crim. Pro. 41(g). Based on factually indistinguishable grounds, the Fifth Circuit found for the suspect and ordered the client material returned in a process akin to the TRO requested here. *Id*. at 598. (The TRO issues are addressed separately herein). The circumstances should be no different here, where Lori Harris isn't even a suspect, and nothing in the probable cause affidavit submitted by Detective

[10] The City has now stated their policy to protect privileged data in its Response, ECF No. 13. Specifically, the aggrieved party (Harris) must make herself a party to an "suit" (the warrant) and file a motion to with the magistrate who failed to protect her in the first place. Because a non-resident, non-party to a criminal investigation has a constitutionally protected right to remain innocent until proven guilty, this is no policy to speak of.

Hoeppner affidavit her in any way to the alleged crime. Viewing the totality of the circumstances, no reasonable person could ever conclude that Harris' equipment should have been seized, much less searched, when all that was disclosed about Harris in the probable cause affidavit was that she "resided" with Nichols. And given what Hoeppner knew at the time that affidavit was executed, that information was demonstrably false.

62. According to the Texas Municipal Courts Education Center Bench Book, the standard for probable cause applied by Texas Magistrates is: "[t]he affidavit must establish a substantial basis for concluding that there is a 'fair probability' that a search will uncover evidence of wrongdoing or that a person has committed an offense." TMCEC Bench Book, Checklist 2-5(1), p. 78 (Dec. 2023), available online at https://www.tmcec.com/wp-content/uploads/2024/05/Bench_Book_-2024_FINAL-Web.pdf (last visited March 30, 2025) (citing *Illinois v. Gates*, 462 U.S. 213 (1983)).

63. Further, the standard applied to probable cause affidavits states that the "affidavit must contain facts, not mere conclusions, from which the magistrate can make an independent determination of probable cause" and importantly, "[t]he determination is based on the totality of the circumstances, practicality, and common sense." *Id.* (citing Tex. Code of Crim. Pro. Art. 18.01(b)).

64. Here, Detective Hoeppner makes no allegations in his probable cause affidavit to support any nexus between Harris, the suspect Nichols, or his alleged crimes. In any manner. And worse, it is undisputed that Det. Hoeppner knew Harris was an attorney who already told him she represented Nichols, the suspect. While the only conceivable basis to obtain an attorneys' client files involving a suspect would be the crime-fraud exception, there is certainly is no crime-fraud exception asserted here. Indeed, there is no discussion whatsoever about how Harris is involved

in any way with Nichols' alleged crime. No amount of common sense could ever give the magistrate judge reason to sign a search warrant broad enough to seize a known attorneys' entire client file system. None.

65. Based on Detective Hoeppner's utter failure to follow the proper protocol set forth in the TMCEC Bench Book Checklist, this gives cause to believe the FWPD and DA now implemented a policy asserting that the police can automatically impute all allegations pertaining to someone who is accused to any other person alleged to "live" with the suspect. The person "living" with a suspect has no constitutional protection of their own. This is patently unreasonable, and as a matter of law, cannot satisfy "a level of certainty more than mere suspicion but less than a preponderance; . . . not a more-likely-than-not standard" which is required by Tex. Code of Crim. Pro. Art. 18.01(b).

66. Further, in the commonsense totality of the circumstances here, an assertion that Harris "live(s)" with Nichols is a mere conclusion, unsupported by anything except for incorrect hearsay opinion of an officer providing security at the arrest of a suspect.[11] Hoeppner does not back up the statement with Harris's drivers' license or a piece of mail belonging to Harris—all of which this record shows were available to Hoeppner and would have indicated that she lived in Virginia. "[I]n order for the affidavit to show adequate probable cause it must set forth underlying circumstances necessary to enable the magistrate independently to judge the validity of the affiant's belief[.]" *Heredia v. State*, 468 S.W.2d 833, 835 (Tex. Crim. App. 1971). There is no way for the magistrate to independently judge the validity of Hoeppner's belief as to Harris's residence here,

[11] The sheriff's deputy who "told" Hoeppner Harris lived at the suspects residence was not an investigator in the arrest of the suspect.

where the wholly conclusory statement as to her residence was already hearsay, and was not supported by actual, tangible supporting evidence.

67. Moreover, even if the magistrate believed Harris lived with Nichols, that is still insufficient for the magistrate to reasonably believe that Harris stored child pornography on the Equipment maintained in her home office. In order for the affidavit to show adequate probable cause, it must set forth underlying circumstances necessary to enable the magistrate independently to judge the validity of the affiant's belief.

68. Here, the totality of the circumstances demonstrates that a supposedly trained and experienced detective under color of law intentionally and maliciously misled a magistrate into unwittingly violating Harris' constitutional rights—resulting in the illegal seizure of her property. And now, the same detective compounds the matter by omitting material facts relating to Harris's law license and client files, causing a state district judge acting as a magistrate to violate Harris' and her clients' constitutional rights in the process. This extreme, intentional, malicious, outrageous conduct is not tolerated by the federal courts in Texas, as the Fifth Circuit makes brilliantly clear in *Harbor*, 5 F.4th at 599. Thus, like Harbor, the appropriate remedy is to grant Harris's TRO, order her Equipment immediately returned, and require the FWPD to complete a constitutionally sound warrant before seizing data the policymakers know to be constitutionally protected.

**The officers actions and inactions independently satisfy the elements of a stigma-plus-infringement claim under section 1983.**

69. Even assuming arguendo the affidavit is not so facially overbroad so as to constitute an unreasonable seizure of constitutionally-protected information, the evidence establishing what the officers knew at the time they obtained the 2025 Search Warrant and Device Warrant also gives rise to a stigma-plus-infringement claim. See ECF Nos. 1-5, 1-6.

70. To establish a section 1983 stigma plus an infringement claim, Harris must "prove that the stigma was caused by a false communication." *Codd v. Velger*, 429 U.S. 624, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977). Here, a "stigma," as has been recognized by the Fifth Circuit, is present because the probable cause affidavit contains a concrete, false factual representations by a state actor of wrongdoing on the part of Harris. *See Shipman v. Sowell*, 766 F. App'x 20, 27 (5th Cir. 2019).

71. First, Det. Hoeppner made a false statement about Harris's residency when he obtained the 2025 Search Warrant adding Harris as a person whose Equipment could be seized from the home of Harris's client-suspect. To the state courts, this was obviously "wrongdoing" since it justified adding Harris to the search warrant and authorizing the seizure of items on her person and where she was sleeping. However, at this point, Hoeppner made no effort to verify the truth of the officer's statement about Harris's alleged "wrongdoing." And the officers on the scene openly refused to allow Harris an opportunity to see the warrant after they had spoken with Det. Hoeppner in the police car. Had any effort been made to test the veracity of the officer's misstatement, it would have been clear that Harris did not reside in the suspect's home. And it was abundantly clear that Harris was an attorney who had already told the officers she represented the suspect in a civil matter. Harris was told that she would be able to speak with the detective and view the warrant when the police interviewed Nichols—another lie depriving Harris a constitutional right to provide her client with adequate legal representation.

72. Second, Det. Hoeppner made a knowingly false statement to obtain the Device Search Warrant on March 18, 2025. ECF No. 1-6. At this point, Det. Hoeppner had personal knowledge that Harris was a Virginia resident. Yet he misrepresented Harris's residence as evidence of

"wrongdoing" that is apparently so egregious that the magistrate judge signed an additional warrant allowing him to search these devices.

73. Additionally, Sargeant Johnson told Harris that her seized Equipment was going to a forensic team and that he would try to move it to the front of the line. These statements were knowingly false. Sargeant Johnson did not inform the magistrate judge that Harris was a lawyer who represented the suspect. He did not tell the magistrate judge that he had promised a forensic unit's availability to an attorney whose seized items contained thousands of unrelated and constitutionally protected documents. Instead, the exact same probable cause affidavit containing a knowingly false statement by Det. Hoeppner was submitted—despite the fact that the officers had a duty to inform the state court and the forensic team that Sargeant Johnson represented was present that the the device warrant would implicate Harris and her clients' known constitutional rights. ECF No. 1-6.

74. The impact of the officers' misstatements of "wrongdoing," made expressly so that they could obtain an overbroad search warrant, cannot be understated. Harris has been deprived of her ability to work. Her clients have been deprived of their right to adequate legal representation. And according to the city attorney in opposition to Harris's application for TRO, the only answer Harris has to receive the right to work again, after spending tens of thousands of dollars to even see the probable cause affidavit that knowingly lied about her residency, is to submit to the state court's jurisdiction and essentially become a defendant herself—just to prove her innocence. ECF No. 13. This, in and of itself, deprives Harris of her constitutional right to remain innocent until proven guilty.

75. But even more to the point, Harris enjoys both a fifth and fourteenth amendment "right to have property and the benefits from it, as well as the liberty to operate a legitimate business,

free from arbitrary deprivation by local police acting under the color of state law." *See Blackburn v. City of Marshall, 542 F.3d 925 (5th Cir. (Tex.) January 12, 1995) (citing San Jacinto Sav. & Loan v. Kacal*, 928 F.2d 697, 700 (5th Cir.1991); *Vandygriff*, 711 F.2d at 1222. "It requires no argument to show that the right to work for a living in the common occupations of the community is of the very essence of the freedom and opportunity that it was the purpose of the [fourteenth] Amendment to secure."). *Truax v. Raich*, 239 U.S. 33, 39–41, 36 S.Ct. 7, 10, 60 L.Ed. 131 (1915).

**COUNT 2 – 42 U.S.C. §1983: *MONELL* LIABILITY CLAIM**
**AGAINST THE CITY OF FORT WORTH POLICE DEPARTMENT**

76. The foregoing paragraphs are incorporated by reference as if fully set forth in this count.

77. Harris also brings suit on behalf of herself and all other lawyers similarly situated against the local policymakers, including the City of Fort Worth and its Fort Worth Police Department. These municipal policymakers can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers. Moreover, although the touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution, local governments, like every other § 1983 "person," by the very terms of the statute, may be sued for constitutional deprivations. *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690-91, (1978).

78. Three essential elements must be established for a municipality to face § 1983 liability. There must be: (1) a policymaker; (2) an official policy; and (3) a violation of a constitutional right whose "moving force" is the policy or custom. *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)).

79. Here, Harris is aggrieved both by a policymaker's action and inaction. As for the policymaker's ***inaction***, Sargeant B. Johnson # No. 3365, acting under the color of law, told Harris that there was an official policy of turning over her client material to a forensic team. ECF No. 1-1 (Harris Dec.) ¶ 36. Indeed, Johnson told Harris that he "might be able to ask forensics to prioritize but I know they will have a lot of work to do on Monday morning." *Id.*

80. At the time Johnson made this statement to Harris, he knew that she was an attorney for Nichols himself, and that she had hundreds of other clients whose core work product and privileged material was stored in the devices the FWPD had confiscated. She had twice asked to see the probable cause affidavits that supported the overbroad warrants and was refused. And indeed, she did not receive the probable cause affidavits until she hired both civil and criminal counsel to negotiate with the City and District Attorneys' office on her behalf.

81. Once Harris learned that the affidavits contained none of the statements the officers knew to be true regarding (1) her residence, (2) her status as an active attorney representing the suspect, or (3) the fact that her devices contained work product and privileged information of hundreds of clients unrelated to the investigation, she inquired into the City's protocol for protecting this information. To date, despite over twelve attempts by her criminal attorney to communicate and multiple passes by her civil attorneys, not a single effort has been made to safeguard her devices—despite the fact that she is not indicted, not a suspect, not under investigation and, most importantly, not a criminal defendant. Indeed, during the course of conferencing regarding the pending TRO in this case counsel for the City blatantly refused to identify any process or policy in place with the Fort Worth Police Department to constitutionally protect Harris and her clients' rights. Point in fact, he stated Harris' counsel's questions in this regard were "silly"!

82. Here, the FWPD is liable as a municipality because the policy expressed by Johnson was the "moving force" behind the constitutional violation that has gravely impacted Harris and her clients. *See Piotrowski*, 237 F.3d at 580 (quoting *Monell*, 436 U.S. at 694, 98 S. Ct. 2018). There is "a direct causal link" between the FWPD's policy of turning over seized equipment and examining them in line with all other seized items, without any preference or protocol in place to safeguard constitutionally protected private information and work product stored by active attorneys. *See James*, 577 F.3d at 617 (quoting *Piotrowski*, 237 F.3d at 580). By telling Harris that the forensic officer would "be busy" on Monday, and then deliberately failing to correspond with the counsel Harris hired for over two weeks after being informed that her clients' documents were at risk, the FWPD's forensic document policies have been implemented with "deliberate indifference" to the "known or obvious consequences" that constitutional violations would result. *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 407, 117 S.Ct. 1382 (1997).

83. Moreover, because the information contained on Harris's computers belongs to hundreds of clients who are wholly unrelated to the FWPD's investigation, "it should have been apparent to the policymaker that a constitutional violation was the highly predictable consequence of a particular policy." *Burge v. St. Tammany Par.*, 336 F.3d 363, 373 (5th Cir. 2003). The FWPD apparently has no posted protocol for extracting or safeguarding constitutionally protected data belonging to clients unrelated to the suspect of a criminal investigation. Instead, as has already been admitted in the City's brief in opposition to Harris's TRO, the only remedy Harris has to attempt to curtail the overbroad warrant is to appear before the magistrate who issued the warrant and plead her case for safeguarding her client material there:

> If Plaintiff Harris wants to assert attorney-client and/or work product privilege to any files she asserts are contained on any devices being analyzed, she should seek redress of her allegations, and present her evidence to Criminal District Court No. 3 as provided by Texas

> Code of Criminal Procedure §§18.10, 18.12 and 18.1331 and seek to modify that courts' order with respect to those files or those devices.

ECF No. 19.

84. If this is the City's actual policy for handling privileged, core work product, then it is unconstitutional on its face. A non-resident of the State of Texas who is an officer of the Court should not have to submit to the jurisdiction of Texas criminal court, essentially become an alleged criminal herself, just to avail herself of her constitutional rights. This flies in the face of the constitutional guarantee that Harris is innocent until proven guilty. This simply cannot be the law!

85. If this is not the City's official policy, then an official policy regarding the forensic examination of documents has "arise[n] in the form of a widespread practice that is so common and well-settled as to constitute a custom that fairly represents municipal policy." *James v. Harris County*, 577 F.3d 612, 617 (5th Cir. 2009) (quoting *Piotrowski*, 237 F.3d at 579) (quotation marks omitted). Specifically, although Fort Worth is the fourteenth largest city in the United States, it is woefully behind the curve in terms of implementing infrastructure sufficient to meet the growing demands of forensic computer extraction. As a consequence, the Detectives and Sergeants of the FWPD are able to make false reports to magistrate judges, bootstrap non-parties into existing search warrants, then take anything they desire. They can do all of this without any system of checks and balances in place to protect the person whose equipment is seized—until that person proves his or her innocence. This is exactly what has transpired here, where the City's failure to adopt a known data forensic examination policy has empowered officers to pass Harris off to the DA's office, share information between the two entities without taking measures to ensure unrelated client material is identified, affording Harris no legal mechanism to protect her data in the process.

86. Additionally and/or in the alternative, the City of Fort Worth's failure to require the Chief of Police to adopt a forensic data extraction policy deliberately allows the entire police force to act with conscious indifference to the constitutional rights of Harris and her clients, and all other attorneys whose privileged work product may be seized without safeguards in place to protect against extraction of constitutionally-protected documents.

87. As the official policymaker for the City of Fort Worth, the Chief of Police knew or should have known that at least a "taint team" specifically trained to address concerns of active and practicing lawyers whose devices store protected, core work product is needed to safeguard the constitutional rights of Fort Worth citizens. Indeed, Fort Worth is the fourteenth largest city in the United States. A factfinder needs to look no further than a factually analogous case out of Harris County state district court to determine the extent to which another large Texas city takes measures to safeguard constitutionally-protected attorney-client privileged work product. *See In re Cook*, 597 S.W.3d 589, 602 (Tex. App.—Houston [14 th Dist.] 2020, pet. denied). In *Cook*, as in this case, the court recognized that a client "has a legitimate expectation of privacy in her files" which has "roots in federal and state statutory and common law and in the United States Constitution, among other sources." *See id*. (quoting *DeMassa v. Nunez*, 770 F.2d 1505, 1506-7 (9th Cir. 1985). Expressly recognizing that the "use of taint teams has been approved and authorized by courts, the 14th Court of Appeals noted "the expectation and presumption that the Government's privilege team and the trial prosecutors will conduct themselves with integrity." *Id*. (quoting *United States v. Grant*, No. 04CR207BSJ, 2004 WL 1171258, at *3 (S.D.N.Y. May 25, 2004)).

88. Unlike the district court that signed off on Detective Hoeppner's affidavit in this case, however, the trial court in *Cook* "provided a specific and detailed procedure to protect Cook's

attorney-client privilege" which included the following specific measures designed to safeguard the protected nature of the data seized:

- Cook and her attorney representing Cook in the underlying proceeding to recover her files, and the taint team will go through the documents.
- Cook will identify the documents they believe are privileged.
- If the taint team disagrees about which documents Cook claims are privileged, the disputed documents will be submitted for in camera review to the court.
- Until further order of the court, the taint team is not permitted to discuss the contents of Cook's files with other members of the HCDA's Office or law enforcement.

89. Not only is the warrant entirely devoid of any mention of the known fact that the City is in possession of thousands of unrelated protected client documents; Harris has begged the City to point her in the right direction to secure her files to no avail. This gives rise to the City's liability for implementing a policy that deprives Harris and her client's fourteenth amendment rights.

90. This is not the first time that a backlog issue that has resulted in the failure of the FWPD to safeguard its citizen's constitutional rights. In October of 2024, the Chief of Police appeared before the City Council to defend the City's utter failure to adhere to a state law passed in 2019 requiring law enforcement agencies must submit evidence kits to the lab within 30 days of receiving them, then test the kits within 90 days. *See* Lenzen, Cecilia, *Fort Worth police chief vows to address hundreds of untested sexual assault evidence kits*, Fort Worth Report, October 22, 2024, available online at https://fortworthreport.org/2024/10/22/fort-worth-police-chief-vows-to-address-hundreds-of-untested-sexual-assault-evidence-kits/ (last visited April 15, 2025).

91. According to the Fort Worth Report, an NBC investigation recently revealed that "more than 1,700 kits collected by the department since 2019, 767 kits arrived late to the lab, 412 were

submitted more than 100 days late, and 28 were submitted more than a year late." *Id.* Indeed, the Chief of Police told the City Council that said the department's backlog is "completely unacceptable," and the department is urgently looking at options to ensure such an issue can never happen again. *Id.* In October of 2024, the Chief of Police anticipated that the backlog would be fully addressed by April of 2025. Based on Sargeant Johnson's comment regarding the forensic data unit's backlog, it is reasonable to believe that the backlog that plagued the forensic lab unit similarly plagues the investigation unit here.

92. Mayor Mattie Parker, as well as all City Council members, are well aware that the FWPD's inadequate policies on forensic lab procedures have allowed the police to run roughshod over its citizens' constitutional rights. According to KERA news, the city commissioned a review of the Fort Worth Police Department's policies and practices after a former Fort Worth police officer shot and killed Atatiana Jefferson while on duty in 2019. *See* Miranda Suarez, *Unnecessary force and 'aggressive conduct' go unpunished among Fort Worth police, report states,* KERA, published September 7, 2022, available online at https://www.keranews.org/news/2022-09-07/unnecessary-force-and-aggressive-conduct-go-unpunished-among-fort-worth-police-report-states, last visited April 15, 2025.

93. Three years later, the review of the Fort Worth Police Department found "a pattern of unnecessary use of force among police officers, a failure to deescalate tense situations, and a wide gulf between what the department says it wants to do and what officers are doing in the street." *Id.* Even though that report was presented in 2022, Noakes appeared on the forensic backlog issue as late as October of 2024, promising to have fully addressed the issue by April of 2025. With April halfway gone and no report of the FWPD published to date, this supports the fact that the City's has an unspoken policy of giving police subordinates unfettered access to constitutionally

protected information without ample safeguards designed to protect the privacy of the information seized.

94. Moreover, in August of 2024, the City Council approved a $9.6 million settlement on a Whistleblower claim brought by the FWPD's former chief of police and former high-level IT officials. *See* Keenan Willard, *Fort Worth settles whistleblower lawsuits for $9.6M*, *ending legal battle with former police chief*, NBCDFW Web Site, published August 13, 2024 available online at https://www.nbcdfw.com/news/local/fort-worth-settles-whistleblower-lawsuits-for-9-6m/3620744/, last visited April 15, 2025. According to the attorney for the three Whistleblowers, the dispute was over "the city's compliance with Criminal Justice Information System regulations." According to NBC news, the dispute was over the FWPD's reaction to news that "the city did not have proper encryption between city facilities." *Id.* This information was uncovered during the 2018 audit by the state's Criminal Justice Information System, "a database run by the FBI that provides police departments access to mugshots, evidence, and criminal records." *Id.* Specifically with regard to the FWPD, the former police chief emailed the city manager David Cooke and then-assistant city manager Jesus Chapa to notify them, "The DPS auditor began his compliance checklist and found the third standard, point-to-point encryption, out of compliance."

95. Because the Chief of Police was fired over this audit incident and has since settled with the City for over $5 million, it remains unclear what measures, if any, have been taken to address of the City's lack of protocol surrounding data encryption. This proves the City's awareness of the lack of staff and protocol available to properly encrypt data within the FWPD, which is causally linked to the damage caused by the City's refusal to implement express protocol to forensically safeguard Harris's seized data. As a result, this directly causes the violation of Harris's

constitutional right to work, adequately represent her clients, maintain her privacy, be free from unreasonable seizure, and remain innocent until proven guilty.

96. Finally, the fact that there is no policy requiring officers to report the full extent of their knowledge regarding the types of data seized on a lawyer's hard drive in the probable cause affidavit is endemic of the widespread policy of leaving the officers to their own devices when a policy should otherwise be implemented to protect privileged data. This is so similar to the FWPD's failure to properly handle thousands of rape kits and refusal to properly encrypt data that, taken together, makes clear that the City of Fort Worth's lack of forensic data policies of any kind directly impacts on the known rights of its citizens.

## COUNT 3– 42 U.S.C. §1983: EXCESSIVE-FORCE CLAIM AGAINST DETECTIVE RICHARD HOEPPNER, SARGEANT JOHNSON AND OTHER UNNAMED OFFICERS IN THEIR INDIVIDUAL CAPACITIES

97. The foregoing paragraphs are incorporated by reference as if fully set forth in this count.

98. The Officers involved in the unlawful search and seizure of Harris's property acted willfully, deliberately, maliciously, or with reckless disregard for Harris's established constitutional rights.

99. On March 15, 2025, Detective Hoeppner of the FWPD added Harris to a probable cause affidavit based on knowingly false and incomplete information.

100. Specifically, at the time Hoeppner added this paragraph to the probable cause affidavit, he had knowledge of the fact that Harris was an attorney who had announced herself as Nichols's counsel. ECF No. 1-1 (Harris Dec.) ¶¶ 5-7. Because of this knowledge, Det. Hoeppner had a duty to include this information in the probable cause affidavit prior to obtaining a search warrant related to Lori Harris. He did not.

101. Additionally, the only information Hoeppner added to the probable cause affidavit related to Lori Harris was conclusory hearsay from another unidentified officer regarding Harris's residence. ECF No. 1-4 (2025 Search Warrant Probable Cause Aff.) ¶ 29. He obtained this information from another officer who arrested Nichols several hours earlier, yet he failed to confirm Harris's residence prior to adding a conclusory paragraph in the probable cause affidavit and making Harris the subject of the search warrant.

102. With full knowledge that Harris was an officer of the court, and having told Harris that she would be contacted once Detective Hoeppner began interviewing Nichols, Det. Hoeppner obtained a facially overbroad search warrant and assembled a team of 12 SUV police cars with a team of at least ten officers wearing flak jackets and helmets and carrying long guns in addition to side arms. Hoeppner did this intending that it would intimidate and harass Harris. When the police officers yelled and pointed their long guns at Harris at around 12:30 am on March 16, 2025, they did fully intimidate and harass Harris and caused her mental anguish in the process.

103. Det. Hoeppner then directed other unnamed officers to hold Harris hostage in the cold, outside lawn of the neighbor's yard—another intimidation move meant to embarrass and harass Harris. It did embarrass and harass Harris and caused mental anguish. Harris was physically struggling being held without adequate clothing and shoes for four hours while Detective Hoeppner directed the unlawful search and seizure of her remote law office. Whenever she asked to be let in out of the cold, she was instructed to remain still, at the side of an officer armed with a loaded side arm, for over four hours.

104. In light of the circumstances—specifically in light of the fact Harris repeatedly told the officers she was an attorney whose privileged material was being confiscated against her will—

the amount of forced used to conduct the search of Nichols's home and Harris's remote law office was unreasonable.

105. Additionally, after the police were informed that Harris was an attorney whose work product, privileged client files were inside the home, the police intruded inside a room marked "Esq." and opened and least one sealed envelope from a United States government agency—which was addressed to Harris's law office in Virginia and marked "Attorney Copy." The police also opened Harris's suitcase and rummaged through her personal effects, including her underwear. The police knew that the search warrant executed was for the purpose of locating digital information that could transmit child pornography. Under these circumstances, this search was unreasonable. Consequently, the injuries suffered by Harris through the excessive use of force are material.

**G. DAMAGES**

106. The foregoing paragraphs are incorporated by reference as if fully set forth in this count.

107. As a direct and proximate result of the FWPD's actions, Harris suffered the following injuries and damages.

a. Mental anguish in the past and future.

b. Lost earnings.

c. Loss of earning capacity.

d. Property damage.

e. Loss of reputation in the legal community including, but not limited to, judicial interactions.

f. Punitive damages.

**H. DECLARATORY RELIEF**

108. The foregoing paragraphs are incorporated by reference as if fully set forth in this count.

109. Harris also seeks "a declaration that the acts and omissions described herein violate her rights under the U.S. Constitution. Here, the FWPD has illegally seized the property of Lori Harris without proper protocols in place for safeguarding what is known to be sensitive and constitutionally protected client information. Because the FWPD has refused to return her Equipment and has not engaged her counsel with the procedures being followed to ensure her client's data is protected, a "a substantial and continuing controversy between two adverse parties ... [that is] real and immediate, and create[s] a definite, rather than speculative threat of future injury." *Bauer v. Texas*, 341 F.3d 352, 358 (5th Cir. 2003).

110. Even though Harris is not indicted, has not had a FWPD investigation initiated against her, and was unwittingly made the subject of an ongoing investigation without probable cause, Harris has not been able to secure or recover her client data after two weeks of negotiations with the FWPD. And despite having engaged counsel to ensure her clients are protected, there is no cognizable legal mechanism for her clients to seek redress. Accordingly, there is a real and immediate threat of repeated injury in the future. Thus, Harris is suffering both a continuing harm or immediate threat of repeated harm entitling her to a declaration that the FWPD's current lack of protocol for handling confidential privileged work product of its suspects is unconstitutional.

## I. TEMPORARY AND PERMANENT INJUNCTIVE RELIEF

111. The foregoing paragraphs are incorporated by reference as if fully set forth in this count.

112. Harris and her clients will likely suffer imminent and irreparable injury if the FWPD is not immediately enjoined from retaining, copying or retaining any copies of the contents of the electron devices of Lori E. Harris, specifically, items 1, 6, 9, and 10 on the Seized Evidence Inventory Form of the Fort Worth Police Department dated 3/16/2025, Report # 230030825, ECF No. 3-1. This form lists the Owner as Ernest Nichols and is signed by Richard Hoeppner 4006.

*Id.*[12] For this reason Harris's application for an *ex parte* Temporary Restraining Order requiring the FWPD to immediate return of Harris's devices is being filed concurrently with this Complaint and is incorporated by reference herein. ECF No. 3 ("TRO"). However, this incident has uncovered a continuing controversy regarding the FWPD's lack of protocol for properly handling the seizure of items containing known client material from attorneys.

113. Because of the FWPD's lack of protocol for regarding the handling of seized privileged material—whether seized lawfully or unlawfully, Harris and any attorney implicated in a FWPD investigation suffer injury that is imminent and irreparable because the FWPD's conduct results in their clients having no effective assistance of counsel.

114. Here, all of Harris's legal files and all data related to the clients she represents are on her MacBook and her external hard drive. She cannot effectively represent a single client without these devices. And once this data is in the hands of the police, damage to her clients is irreparable. *See Harbor Healthcare Sys., L.P. v. United States*, 5 F.4th 593 (5th Cir. 2021) (finding disclosure of attorney-client privileged material constitutes irreparable harm).

115. Further, no monetary damages will possibly compensate any of Harris's aggrieved clients if the Fort Worth Police work with other law enforcement agencies. In addition, it is highly likely that the prosecuting team will continue to possess some of Harris' clients' privileged materials and/or these materials are about to be handed over to other law enforcement absent court intervention.[13] *See Sierra Club v. United States Army Corps of Engineers*, 482 F. Supp. 3d 543,

---

[12] One of the items on the list is identified as belonging to Harris. As such, it should have been listed in a separate Seized Evidence Inventory Form with Harris' name. The additional form should have included the other three (3) devices.

[13] Harris represents so-called "ghost" immigrants who are outside the asylum process of US Immigration. Such individuals are clearly protected under the Constitution under current Federal Law. These individuals, if caught, cannot leave and return legally to the United States due to lengthy immigration bars. Many of these individuals were

555 (W.D. Tex. 2020) (imposing a "highly likely" standard to satisfy the imminent harm inquiry). Access by any law enforcement official without probable cause effectively destroys Lori Harris' law practice.

116. Neither Harris nor her clients have any remedy at law, much less and an adequate remedy. *Prudential Ins. Co. of Am. v. Inlay*, 728 F. Supp. 2d 1022, 1030-31 (N.D. Iowa 2010); *see Ruggieri v. M.I.W. Corp.*, 826 F. Supp. 2d 334, 336 (D. Mass. 2011). There is no adequate remedy at law because the City of Fort Worth does not have a constitutionally-sound mechanism to return illegally seized property, much less screen attorney-client privileged material to protect anyone who is not subject to criminal investigation. Indeed, the City attorney has already stated that the City's "policy" with regard to seeking redress for an overbroad seizure is for the aggrieved party to make themselves a party to the criminal lawsuit and convince the criminal judge that they are innocent of the allegations set forth in the probable cause affidavit. Because this flies in the face of an individual's constitutional right to remain innocent until proven guilty it constitutes no remedy whatsoever. In fact, the Fifth Circuit has already recognized that someone who has not been indicted has no mechanism to recover their property except through a civil suit. *See Harbor*, 5 F4.d. at 596.

117. Finally, there is a substantial likelihood that Harris will prevail on the merits here, where not only is the warrant used to seize her Equipment facially overbroad, but the Detectives acted with knowing disregard of the truth in obtaining that warrant. *Prudential Ins. Co.*, 728 F. Supp. 2d at 1029; *Fairchild Semiconductor Corp.*, 564 F. Supp. 2d at 66-67. Given the timing of the warrants and the undisputed fact that the officers knew the probable cause affidavit told a different

---

lured to the United States by prior administration and statutes that have now changed and need absolute privacy as they weigh their legal remedies. They cannot be unmasked without extreme peril to them and their lives.

story that the one they were receiving from Harris, the Fort Worth Police and Detective Hoeppner have no known legal basis for seizing and searching Harris' equipment.

**J. ATTORNEY FEES**

118. The foregoing paragraphs are incorporated by reference as if fully set forth in this count.

119. Harris is entitled to an award of attorney fees and costs under 42 U.S.C. §1988(b) and 28 U.S.C. § 2201.

**K. PRAYER**

120. For these reasons, Plaintiffs ask for judgment against Defendants for the following:

a. Actual damages

b. Punitive damages

c. Reasonable attorney fees

d. Declaratory Relief

e. Injunctive relief

f. Post judgment interest, costs of suit, and any other relief Harris may show herself to be justly entitled.

Dated: April 15, 2025

Respectfully Submitted:

Donal R. Schmidt, Jr.

THE SCHMIDT FIRM, PLLC
Donal R. Schmidt, Jr.
Texas Bar # 00798486
Leslie Ritchie Robnett
TEXAS BAR No. 24065986
PO Box 370
Stephenville, Texas 76401
Tel: (214) 236-1363

**COUNSELORS FOR PLAINTIFF LORI E. HARRIS**

**Certificate of Service**

I hereby certify that this First Amended Complaint was served on all parties of records through the Court's ECF system in accordance with the Federal Rules of Procedure on April 15, 2025.

s/ Donal R. Schmidt, Jr.